JOSEFINA, DOLORES, CARMEN Y ENRIQUE AMY RAMÚ, demandantes-apelados-apelantes, *v.* SUCESIÓN DE DON EUGENIO M. VERGES, compuesta de su viuda CAROLINA RIEFKOHL, y de sus hijos EUGENIO, EUGENIA y ADELA VERGES RIEFKOHL, demandados-apelados-apelantes.

No. 3712.—*Visto:* Marzo 24, 1926. *Resuelto:* Julio 6, 1927.

1. MENORES—BIENES Y TRASPASOS—AUTORIZACIÓN JUDICIAL PARA VENDER O ENAJENAR BIENES INMUEBLES DE MENORES—DE LA VENTA—SU VALIDEZ.—La venta que, previa declaración de necesidad y utilidad, se hizo de los bienes a que se contrae esta acción *se resolvió:* fué hecha por una debida consideración y sin que para obtener la orden al efecto se practicara fraude alguno en la corte a la que se solicitó la autorización judicial.

2. MENORES—BIENES Y TRASPASOS—AUTORIZACIÓN JUDICIAL PARA VENDER O ENAJENAR BIENES INMUEBLES DE MENORES—PRODUCIDO DE LA VENTA—SU REINVERSIÓN—FALTA DE REINVERSIÓN Y EFECTO.—A falta, en 1805, de un pre-

cepto estatutorio o de disposición alguna en la orden autorizando la venta o enajenación de unos bienes de menores respecto a la reinversión del producido en ella, la responsabilidad del padre en relación con tal reinversión difícilmente descansa sobre el comprador de la propiedad o sobre un comprador de propiedad traspasada al padre de tales menores a fin de ser gravada posteriormente en beneficio y utilidad de ellos.

3. MENORES—BIENES Y TRASPASOS—CONFIRMACIÓN O RATIFICACIÓN—EN GENERAL.—Discutidos los hechos *se resolvió* que aunque no fuese necesario basar la decisión, como en casos anteriores de esta naturaleza, directamente sobre cualquier ratificación implícita por parte de los demandantes de la transacción en que estaba envuelta la enajenación de su propiedad, no obstante, la prueba aducida por los demandantes en apoyo de su defensa sobre este fundamento, había suministrado una base mejor sobre la teoría de ratificación que la que fué sentada en algunos casos anteriores, como por ejemplo el de *Torrellas* v. *Santos et al.,* 34 D.P.R. 90, en que la mayoría de los jueces de esta corte a su vez llegó a la conclusión de que ''la prueba sobre la confirmación o ratificación era más robusta que en el caso de *Díaz* v. *Llenza* confirmado recientemente por la Corte de Circuito de Apelaciones, Primer Circuito, 285 Fed. 132.''

SENTENCIA de *Gabriel Castejón,* J. (Guayama), declarando nulo e inexistente un contrato de venta de una finca, y declarando ésta propiedad de los demandantes, con costas. *Revocada,* declarándose sin lugar la demanda.

*Jacinto Texidor,* abogado de los demandantes-apelantes-apelados; *Tomás Bernardini de la Huerta,* abogado de la demandada-apelada-apelante.

EL JUEZ ASOCIADO SEÑOR HUTCHISON, emitió la opinión del tribunal.

Los demandados, los herederos de Eugenio Marcelino Verges, apelan de una sentencia en un pleito de reivindicación de dos fincas rústicas, conocida una de ellas con el nombre de ''Adela,'' y situadas ambas en el barrio de Jobos, de Guayama, las cuales fueron vendidas en el año 1895 a Eugenio Marcelino Verges por Enrique Amy Pareñó como representante legal de sus menores hijos, los aquí demandantes, en cumplimiento de dos órdenes distintas dictadas por un tribunal competente, a instancias de dicho Amy Pareñó, autorizando tal traspaso; así como del pronunciamiento de costas.

La demanda es un documento formidable. Copiamos de la misma lo siguiente:

"Alegan los demandantes que no habiendo pagado don Enrique Amy a don Eugenio Marcelino Verges la cantidad que le adeudaba y por la que le dió la garantía que se expresa en la precedente alegación, convinieron ambos por comodidad de sus negocios, en sustituir dicha garantía con otras fincas; y no teniendo don Enrique Amy finca propia que conviniera a su acreedor, puestos ambos de acuerdo y con perfecto conocimiento por parte de los dos de la naturaleza y calidad de la nueva garantía convinieron en que la constituirían con las dos fincas que se han descrito en esta demanda en la alegación III, que en aquel tiempo, o sea en el año 1895, eran ya propiedad de los ahora demandantes, que las habían adquirido por herencia de su madre doña Carlota Ramú, y esposa que había sido de don Enrique Amy. Y siguiendo los términos de tal acuerdo, don Enrique Amy Pareñó, acudió al Tribunal competente promoviendo un expediente de autorización judicial, como padre de los ahora demandantes, para que le permitiera vender las dos fincas antes referidas, por razón de utilidad y necesidad para los menores, fundando tal petición en hechos que no eran los de la existencia de sus pactos y convenios con don Eugenio Marcelino Verges; y obtenida tal autorización sobre tales fundamentos, don Enrique Amy y don Eugenio Marcelino Verges, conocedores ambos de todos esos hechos, otorgaron en once de marzo de 1895, escritura por la que se hacía aparecer que don Enrique Amy vendía a don Eugenio Marcelino Verges, por precio recibido, las dos fincas que se han descrito en esta demanda en la alegación III. Pero alegan los demandantes que inmediatamente de otorgado tal documento, suscribieron los dos señores Amy y Verges otro documento, de carácter privado, estableciendo el verdadero convenio que entre ellos había existido, y haciendo constar el hecho que ahora los demandantes alegan de que en tal supuesta compraventa no medió precio, ni entrega del mismo, y sí solamente una garantía para el pago de 6,667 pesos con 80 centavos, que el Sr. Amy adeudaba al Sr. Verges."

También los demandantes alegaron expresamente que Verges nunca poseyó dicha finca en concepto de dueño y que jamás tuvo la intención de adquirirla para sí, sino que estuvo en posesión de la misma hasta su muerte, y los demandados han continuado en tal posesión; que los demandantes en ninguna ocasión han ratificado o consentido a la venta o traspaso de las fincas y nunca han recibido el precio de dicha venta ni parte del mismo,

En. el caso de *Amy* v. *Verges,* 33 D.P.R. 372, éstas y otras alegaciones allí enumeradas fueron interpretadas liberalmente y aceptadas como ciertas en la forma alegada, con el fin de sostener que la demanda aducía hechos suficientes para constituir una causa de acción, al ser atacada por una excepción previa. Sin embargo, el caso, según se desarrolló por la prueba aducida en el juicio, reveló una situación muy distinta en sus detalles esenciales de la indicada por la demanda.

Las dos órdenes autorizando la venta de las dos fincas en cuestión fueron dictadas en dos procedimientos distintos. Los autos originales de uno de estos procedimientos, aparentemente del primero que fué instituído, parecen haberse perdido. Los autos que tenemos a la vista no contienen copia de la petición radicada primeramente solicitando la autorización judicial, y en la orden que se. dictó posteriormente, de conformidad con la súplica de la referida petición, no hay nada que indique que los dichos o declaraciones de los testigos presentados en su apoyo encubrieran a la corte o dejaran de revelar o en alguna forma tergiversaran el verdadero carácter de las relaciones existentes entre Amy y Verges, o de la transacción proyectada, que había sido convenida por ellos.

La petición en el segundo procedimiento, en lo pertinente, así como las dos órdenes en cuestión, se copian al margen.[1]

La única prueba sobre la cual los demandantes fundan su reclamación respecto a una venta simulada y una substitución material de la propiedad perteneciente a ellos como garantía del pago de la deuda previamente garantizada por una enajenación similar de otra finca perteneciente a Amy, consiste en dos documentos privados, suscrito uno de ellos por Eugenio Marcelino Vèrges en 1886, y el otro por Verges y Amy al efectuarse la llamada venta. simulada de la propiedad de. los demandantes, y habiendo sido ambos do-

---

[1] Véase el final del tomo.

cumentos copiados íntegramente en el caso de *Amy* v. *Amy,* 15 D.P.R. 415, no es necesario volverlos a copiar ahora. No hay nada en ninguno de estos documentos que sostenga la teoría de una garantía substituída, de una venta simulada, de fraude a la corte, o de que se dejara de cumplir substancialmente con los términos y condiciones de las órdenes autorizando la venta.

En el caso anteriormente mencionado, al referirse a estos documentos, y citando con aprobación de la opinión del juez de la corte de distrito, esta corte dijo:

"La prueba que para justificar tal simulación, se aduce, son los documentos privados, otorgados en las indicadas fechas, y las declaraciones de varios testigos, entre ellos los mismos Sres. Verges y Amy, tendentes a justificar que dicha finca estuvo siempre en poder del Sr. Amy, demandado. Estos documentos privados ni en su letra ni en su espíritu niegan la existencia y realidad de los traspasos verificados por escritura pública y únicamente aclaran lo relativo al precio o valor señalado a la finca; pero aun concediendo a esta prueba y a las declaraciones de los testigos, todo el alcance que intentan los demandantes, llegaríamos a la conclusión de que esos contratos están fundados en otra causa, verdadera y lícita, según la misma prueba, y por tanto, aquellas escrituras de traspaso no adolecen del pretendido vicio de nulidad y según tiene declarado el artículo 1243 del Código Civil, (1276 del antiguo); y según tiene declarado al interpretar este artículo el Tribunal Supremo de España, en su resolución de 14 de marzo de 1891, en que se sostiene que:

" 'La simple expresión de una causa inexacta o falsa hecha por las partes al otorgar el contrato, no lo anula, siempre que resulte fundado en otra, que aun cuando distinta de la expresada sea verdadera y lícita; porque en tal caso siendo tan sólo aparente la falta de causa, resulten eficaces las obligaciones contraídas por los interesados con pleno conocimiento de la verdad.' "

La enajenación que primeramente se tuvo en mente en aquel entonces era el traspaso en 1886 por Amy a Verges de la propiedad conocida más tarde con el nombre de "Trinidad," la cual fué traspasada por Verges a Amy en el

1895 contemporáneamente con la venta de la finca que ahora los demandantes tratan de reivindicar.

Pero lo que se dijo en aquel entonces con relación a tal transacción es aplicable con tanta, si no con mayor fuerza, a la venta posterior que estamos considerando.

Y sobre el mismo aspecto del caso anterior, la corte, en la página 408, se expresó de la siguiente manera:

"Con respecto a la acción sobre reivindicación, estamos de acuerdo con la corte inferior en que no se probó fraude alguno en la escritura por parte de Amy a Verges o de este último a Amy. El hecho de no haberse expresado debidamente el precio, no importa, puesto que había una causa lícita para el traspaso, o sea la deuda que tenía Amy con Verges. La Sra. Carlota Ramú fué parte en la escritura y no vemos cómo puedan ser oídos sus herederos para afirmar que un acto de fraude por parte de dicha señora pueda redundar en beneficio de ellos. Amy que fué un testigo de los demandantes, declaró que cuando se hizo el traspaso a él por Verges creyó que arreglaría todo con sus acreedores (Exposición, p. 29) y es ocioso por parte de los apelados el sugerir que él trataba de defraudar a sus propios hijos. En el caso presente no existe ninguna prueba de haberse cometido fraude. Al parecer todo el mundo obraba de buena fe."

Ahora, al igual que al tiempo de nuestra decisión del caso de *Amy* v. *Amy, supra,* "el hecho de no haberse expresado debidamente el precio, no importa." Aunque estaríamos igualmente justificado para decir lo menos, no necesitamos ir tan lejos para insistir ahora en asegurar, en lo que concierne a Amy Pareñó, que "es ocioso por parte de los apelados el sugerir que él trataba de defraudar a sus propios hijos." La manifestación que hemos transcrito últimamente proclama cuál pudo haber sido, con toda probabilidad humana, la actitud mental del juez de primera instancia de Guayama hacia tal sugestión, si se hubiese hecho durante el curso del procedimiento instituído por Amy Pareñó en 1893.

Evidentemente, Verges consideró el traspaso de 1886 como una mera garantía de la deuda de Amy Pareñó y

tuvo la intención de considerar la escritura como una de hipoteca, no. importa cuál pudiera haber sido el entendido o convenio entre las partes sobre este extremo en aquella época. También es claro que no medió dinero alguno en la transacción de 1895, pero no se desprende que el traspaso de la finca perteneciente a los demandantes en marzo del año últimamente mencionado fuera la mera substitución de una garantía por una deuda preexistente, o sin que Verges satisficiera el valor adecuado y suficiente directa o indirectamente a los demandantes. Tampoco el memorándum suscrito por Verges y Amy en la fecha del doble traspaso robustece la teoría de los demandantes en cuanto a la transacción. Dicho documento no menciona ni sugiere una substitución de garantía, y sí habla en términos claros de un arreglo o convenio amistoso sobre la deuda de Amy a Verges. El precio para la liberación y traspaso por Verges de la finca de Aguamanil conocida por "Trinidad" fué el traspaso absoluto a él de la propiedad de Jobos perteneciente a los demandantes, en pago y satisfacción de la deuda de Amy. El precio para la enajenación de la propiedad perteneciente a los demandantes fué el traspaso por Verges a Amy Pareñó de la finca conocida por "Trinidad," que era una hacienda de café mucho mayor en extensión, situada más convenientemente, y de mucho más valor que los dos predios adquiridos por Verges, y, en lo referente a los menores, el supuesto beneficio y la utilidad que ellos derivaban de la transacción en su totalidad, incluyendo, si no una expectativa de participar en la propiedad así adquirida por el padre, por lo menos la obligación asumida por él de reembolsarles, cuando llegaran a su mayoridad, una suma equivalente al montante total de su deuda anterior con Verges, que representaba el doble del valor de la propiedad de Jobos, juntamente con la promesa y la habilidad aparentemente acrecentada de Amy Pareñó para prestar la garantía adecuada para el cumplimiento de

su obligación. El resultado neto hubiera sido exactamente el mismo que si Verges le hubiera pagado a Amy 667 *pesos* con 87 centavos en efectivo en presencia de un notario y mediante el otorgamiento de una escritura por la finca de Jobos; y si Amy le hubiera devuelto inmediatamente a Verges el mismo dinero en efectivo, igualmente en presencia de un notario, al firmarse la segunda escritura, como el precio material por la liberación y traspaso de la hacienda de café.

Cualquier duda de lo que realmente ocurrió y en cuanto al verdadero fin e intención de las partes queda aclarada por la existencia de dos asientos de puño y letra de Verges que éste hizo en sus libros al efectuar la transacción anteriormente mencionada. Dichos asientos son como sigue:

"Marzo 12. Por transacción que hago con Enrique Amy por la que le devuelvo la Estancia Trinidad de Guamaní, y le tomo en pago 86.56 cuerdas pastos que tenían sus hijos Amy y Ramú en la Adela (Jobos) propiedad por propiedad sin que cruzare entre nos un céntimo en efectivo. La deuda es la que existe a cgo. de la Estancia Trinidad en mis libros, $6,667.86 y no he cargado jamás intereses en consideración a su posición y para bien de sus otros hijos con Tututa. Los títulos de propiedad han sido hoy pasados por ante el Noto. D. José Mo. Capó, figurando (convencionalmente) la Trinidad con $30,000 y las tierras de Jobos en $3,200, por ser así dentro de la ley por efecto de los dros. rs., pero la operación según he explicado más arriba y consta en documento privado que firmé hoy con Amy.

"Hago entrega desde luego de la Trinidad, pero las tierras de Jobos están comprometidas según contrato con los Amorós Hs. y sólo vence en 1900, contrato que me comprometo respetar mediante el pago de $266.71 anual a contar desde el 1er. plazo de 1894, datando ntro. arreglo desde 1893 y representa 4% anual de intereses sobre la deuda de $6,667.86 durante el tiempo que quede privado de la posesión libre de las tierras de la Adela.

"Marzo 12, 1895. Enrique Amy a Estancia Trinidad. Por traspaso por documento público de dicha estancia, incluído todo gasto de escrituras, etc., de cuenta del 1º, $6,667.86.

"Diversos a Enrique Amy. Bienes Raíces. Por compra a Enrique Amy de 43.28 cuerdas tierras de la Hda. Adela en Jobos de

Guayama, las que correspondieron a Tututa en el reparto de los bienes de su abuelo D. Simón Moret, $1,600. Id. de igual lote del mismo E. Amy que correspondió por igual concepto a don Luis Ramú y le compró Amy con dinero del seguro de vida de Tututa, 1600.

"E. M. Verges, Cuenta Capital. Por rebaja en estimación que hago en la cuenta de Amy por virtud de esta transacción siendo este sacrificio a favor de los hijos menores de Tututa y debe su padre afincar en la finca de café en Guamaní, $3,467.86. (*Total*) $6,667.86."

El propósito de la autorización judicial para la enajenación de la propiedad de los demandantes fué la inversión del producido de la venta para adquirir una finca mayor y de más valor contigua a las fincas que Amy Pareñó tenía en Aguamanil. La permuta de las fincas efectuada en marzo 12 de 1895 fué un cumplimiento substancial de los términos y condiciones de las órdenes en cuestión en lo que a Verges se refería, a menos que las dos órdenes que contenían tal autorización puedan y deban interpretarse en el sentido de exigir un traspaso directo a los menores o a Amy Pareñó como su representante legal, y expresamente en depósito (*in trust*) para ellos, y de imponer a Verges el deber y la obligación de otorgar una escritura en tal forma, o de insistir en la creación y constitución en el mismo documento de una primera hipoteca por Amy Pareñó sobre la propiedad en cuestión a favor de sus menores hijos y por vía de garantía para proteger sus intereses. En ausencia de una disposición expresa a este efecto en las órdenes a que nos hemos referido, o de cualquier insinuación clara de tal fin o intención por parte de la corte que expidió tales órdenes, apenas parecería razonable exigir a Verges un cumplimiento estricto con sus términos y condiciones para la protección de los menores en cuestión, lo que pudo haber sido sugerido por el fiscal o incluído por la corte en sus órdenes, sin necesidad de tal sugestión, pero lo que en realidad nunca fué sugerido o incluído, ni apa-

rentemente en ningún momento estuvo en la mente de ninguna de las partes interesadas.

En nuestra consideración de este asunto, no debemos perder de vista la ley substantiva ni el Código de Enjuiciamiento Civil que estaban en vigor al tiempo que ocurrieron los hechos en cuestión.

Sin embargo, debe notarse de paso que aún bajo las reglas más elásticas de la práctica de equidad en las cortes federales y del estado, "el comprador por lo general no tiene deber alguno de investigar cómo se aplica el producido de la venta." 31 C. J. 1056, pár. 141; *Knotts. et al.* v. *Stearns et al.,* 91 U. S. 638.

Más aún: "Cuando una corte tiene jurisdicción para ordenar que se efectúe una venta y de la propia faz de los procedimientos con respecto a la misma aparece que éstos son regulares, y alguien compra la propiedad de buena fe, por buena causa y sin conocimiento real o implícito de algún defecto o irregularidad que a lo sumo harían la venta anulable, su título será protegido; y bajo esta regla, un comprador no será desposeído a causa de fraude por parte de un tutor que hizo que se efectuase la venta, cuando tal comprador no tenía conocimiento de tal fraude." 28 C. J. 1201, pár. 351.

Y, aunque el comprador no puede evadir la doctrina de *caveat emptor,* en circunstancias que justifiquen su aplicación, sin embargo,

". . . No está obligado a investigar las irregularidades que no aparecen de los autos; ni se le exige que investigue lo sucedido con anterioridad a la sentencia o resolución que reconoció la necesidad de que se realizase la venta." *Id.* 1202.

Además,

"A menos que el estatuto lo exija, no es necesario para la validez de la venta, que el tutor haga un informe de la misma a la corte." *Id.* 1189, pár. 329.

No sólo deben considerarse los hechos en el presente

caso desde el punto de vista de los códigos Civil y de Enjuiciamiento Civil anteriores, sino que, a fin de obtener tal punto de vista e incidentalmente, la única perspectiva verdadera o adecuada, ambos códigos deben ser interpretados a la luz de su historia y teniendo en gran estima la santidad de la patria potestad así como la pureza en que es de presumirse se basa y que gobierna el ejercicio de tal poder.

Los artículos 164 del Código Civil y 2014, 2022 y 2023 del Código de Enjuiciamiento Civil vigentes en esta isla con anterioridad al 1904, leen como sigue:

"Art. 164. El padre, o la madre en su caso, no podrán enajenar los bienes inmuebles del hijo en que les corresponda el usufructo o la administración, ni gravarlos, sino por causas justificadas de utilidad o necesidad, previa la autorización del Juez del domicilio, con audiencia del Ministerio Fiscal, salvas las disposiciones que, en cuanto a los efectos de la transmisión, establece la Ley Hipotecaria."

"Art. 2014. La autorización se concederá en todo caso bajo la condición de haberse de ejecutar la venta en pública subasta, y previo avalúo si se tratare de bienes comprendidos en alguno de los números 1º, 3º ó 4º del artículo 2010.

"Exceptúanse de esta regla las ventas hechas por el padre, o por la madre con patria potestad. Estos podrán realizarla sin otro requisito que el de haber obtenido previamente la autorización judicial, con audiencia del Promotor fiscal y de las personas designadas en el art. 204 de la Ley Hipotecaria."

"Art. 2022. Hecha la venta, cuidará el Juez, bajo su responsabilidad, de que se dé al precio que se haya obtenido la aplicación indicada al solicitar la autorización.

"Art. 2023. El precio se entregará, mientras se da la aplicación correspondiente, al tutor o curador si estuvieren relevados de fianza, o si las que tengan prestadas son suficientes para responder de él.

"En otro caso, se depositarán en el establecimiento público en que deban constituirse los depósitos judiciales."

Después de indicar la íntima relación existente entre los artículos correspondientes del Código de Enjuiciamiento Civil, el artículo 144 del Código Civil Español y el 205 de

la Ley Hipotecaria, Manresa, en sus Comentarios al Código de Enjuiciamiento Civil, tomo 6, página 465, dice (bastardillas nuestras):

"En virtud de todas estas disposiciones, el padre o la madre con patria potestad pueden enajenar o gravar dichos bienes de los hijos sin *otro requisito* que el de obtener la autorización del juez de primera instancia del domicilio, previa la justificación de necesidad o utilidad ante el mismo juez con audiencia del Ministerio fiscal."

Scaevola, al discutir los remedios disponibles y los no disponibles a los menores cuyos derechos o intereses han sido perjudicados por el ejercicio indebido de la autoridad paterna bajo la restricción impuesta por el artículo 164 del Código Civil, en su tomo 3, página 319, de sus Comentarios hace la siguiente e interesante comparación:

". . . El art. 1296 dice que la *'rescisión de que trata el núm. 2º del 1291 (contratos celebrados con autorización judicial.'* El legislador ha creído, no sin acierto, que este requisito es suficiente para alejar la posibilidad de lesión en un contrato, y por eso no concede la rescisión en tal caso. Ahora bien: si esto sucede en el caso de los ausentes, con mayor motivo sucederá en el de los hijos, puesto que el contrato es celebrado por el padre o la madre, personas en quienes precisa suponer el más alto grado de cariño. Prueba esto otra consideración, la de que si la venta o el gravamen se llevase a efecto sin la autorización judicial, el contrato sería nulo, a tenor de lo dispuesto en el párrafo primero del art. 4º del Código."

Y más adelante, con respecto al estado de la ley anterior y posterior a la aprobación del artículo 164, considerada desde el punto de vista del remedio, en la página 321 hallamos lo siguiente:

"De lo expuesto se desprende la diferencia radicalísima que en cuanto a los derechos de los hijos, en el caso de la venta de bienes inmuebles hecha por el padre, existe entre el silencio del Código y la doctrina terminante de la ley 24, tít. XIII, Part. 5ª, confirmada en sentencias de 16 de enero de 1862, 30 de diciembre de 1864, 1º de febrero de 1867, 20 de abril de 1870 y 18 de mayo de 1878, que por el solo hecho de la venta declaraba obligados y *empeñados* al hijo los bienes del padre, y si no bastaren, podía demandar los ven-

didos *a quien quier que los fallen e debenlos cobrar.* Lo mismo dicen otras dos más recientes, las de 12 de abril y 30 de 1866 que transcribimos: 'Las enajenaciones hechas por el padre de bienes propios de los hijos—expresa la primera—sólo se anulan y se da contra ella la acción reivindicatoria, según la ley 24, tít. XIII, Part. 5ª, si el hijo no pudiese ser indemnizado con los bienes de su padre y no quisiere heredar de él. Carecen de aplicación al caso presente las leyes referentes a la venta de bienes de menores que no están sometidas a la patria potestad, sino a la guarda de tutores o curadores.'

"La segunda expone que 'con arreglo a la ley 24, tit. XIII, Partida 5ª, el padre que enajena los bienes que el hijo tuvo de su madre responde con los suyos propios *fasta que recibiesse dellos entrega de aquello que el padre le oviese enagenado,* pudiendo el hijo, en caso de insolvencia del padre, *demandar sus bienes a quien que los fallen, siempre que el hijo non quisiere heredar nin aver parte en los bienes del padre.* Cualesquiera que sean las reglas que hoy rigen respecto a la enajenación de bienes raíces propiedad de los menores de edad constituídos en la patria potestad, es lo cierto que en la época en que tuvo lugar el contrato relativo a la finca de que se trata, el padre podía proceder a la venta de los bienes raíces del peculio adventicio del hijo sin necesidad de licencia judicial. La insolvencia en que a su muerte quedó el padre, y la circunstancia de no haber sido su heredero su hijo, hace nacer en favor de éste la acción que le da la ley para *demandar sus bienes a quien quier que los fallen,* sin que obste a ello que la venta se hiciera con licencia judicial ni que se constituyera hipoteca para asegurar la inversión del precio a favor del menor, porque una y otra cosa no eran necesarias para el caso, debiendo además tenerse en cuenta que este último extremo se estableció en beneficio del comprador.' La diferencia es, según hemos dicho, radicalísima y menos favorable a los hijos."

Manresa empieza su comentario del artículo 164 (2 Comentarios al Código Civil, segunda edición, página 41) con la siguiente afirmación:

"Dudoso y vacilante se muestra nuestro derecho antiguo, y, por lo tanto, la jurisprudencia que lo ha interpretado, acerca de si es o no necesaria la autorización judicial para que los padres puedan enajenar o gravar los bienes de sus hijos. En efecto: encontramos establecido claramente en el Fuero Juzgo que el padre *debe*

*tener su buena de los hijos; mas non puede nada vender ende nin
enajenar.* Las Partidas siguen también la doctrina de que como
*quier que tales bienes deben ser del padre e puede esquilmar los
frutos dellos, con todo eso non los debe enajenar en ninguna ma-
nera;* pero añade más adelante, *e si por aventura los enajenase,* ori-
ginándose 'de la interpretación de esta frase la diversidad de crite-
rio a que antes hacíamos referencia.

"En la legislación extranjera no ofrece menores dudas la inter-
pretación de algunos códigos, por ejemplo, el de Francia, acerca del
que sostienen las dos opiniones contrarias Demolombe y Laurent,
afirmando el primero que se necesita autorización judicial, y el se-
gundo que ésta no cabe en los preceptos de la ley.

"Respecto a nuestro Código, no puede haber duda alguna de
que para la enajenación de bienes inmuebles o para gravarlos, es
precisa la autorización judicial."

La cuestión de si un contrato otorgado por un padre de
acuerdo con una orden expedida por un tribunal compe-
tente puede considerarse o no anulable en todo caso a ins-
tancias de un hijo o hijos menores de edad al llegar a su
mayoridad, en opinión de Scaevola, es claramente rebati-
ble. Scaevola y Manresa están de acuerdo en que no puede
rescindirse tal contrato. Scaevola insiste en que no pro-
cede una acción por daños y perjuicios. Manresa sostiene
un criterio contrario en cuanto a esto. 2 Comentarios al
Código Civil (segunda edición) página 47.

Que el efecto de una autorización judicial, una vez ob-
tenida, sin tener en cuenta los medios empleados o las cir-
cunstancias envueltas, es el de proteger al comprador y
colocar a los menores en una posición poco ventajosa, es
claramente la conclusión a que llega Scaevola. La bondad
de esa conclusión puede o no estar sujeta a controversia.
Una proposición más significativa y más incuestionable que
se deduce claramente del tenor general y el efecto de los
puntos de vista expresados por ambos comentaristas es que
el artículo 164 del Código Civil fijó una limitación y restric-
ción definida c inequívoca sobre el ejercicio de la tradicional
patria potestad. El alcance y efecto de esta invasión esta-

tutoria de la autoridad y poder paternos deben medirse por el alcance y significado del requisito estatutorio interpretado en relación con otras disposiciones en *pari materia.*

Otro paso largo en la misma dirección, aunque desde luego no retroactivo en sus resultados, fué dado por nuestra Legislatura Insular con el artículo 229 del Código Civil Revisado, según fué enmendado en 1911, artículo que en parte lee así:

"El ejercicio de la patria potestad no autoriza al padre ni la madre para enajenar o gravar bienes inmuebles de clase alguna, o muebles cuyo valor exceda de quinientos dólares, pertenecientes al hijo, y que estén bajo la administración de aquéllos, sin previa autorización de la corte de distrito en que los bienes radiquen, previa comprobación de la necesidad o utilidad de la enajenación o el gravamen, y de acuerdo con lo dispuesto en los artículos 80, 81 y 82 de la ley referente a procedimientos legales especiales."

El artículo 82 de la Ley referente a procedimientos legales especiales, dispone que:

"En cualquier caso en que el juez autorice al solicitante para algún acto o contrato, en que el menor o incapaz obtenga dinero u otros valores, la resolución determinará la colocación o inversión de lo adquirido y el fiscal vigilará por los medios que considere adecuados el cumplimiento de la resolución judicial.

"La subasta de bienes propiedad de menores o incapaces deberá verificarse ante el márshal del distrito, previa publicación de los edictos correspondientes.

&ast;       &ast;       &ast;       &ast;       &ast;       &ast;       &ast;

"Cualquier infracción de la orden dictada por el juez, será castigada como desacato, sin perjuicio de las responsabilidades civiles y criminales en que el infractor incurra."

Omitimos aquí las elaboradas disposiciones de los artículos 80 y 81 para mayor brevedad.

El fin obvio de estas disposiciones más recientes no fué meramente restablecer las reglas prescritas por las leyes en vigor al tiempo de adoptarse nuestro Código de Enjuiciamiento Civil actual y suplir las omisiones del mismo, sino también para proveer protección adicional para los

derechos de los menores, confiriendo a la corte y a los fiscales poderes que no tenían, e imponiéndoles deberes y responsabilidades que no existían bajo el Código Civil español y su sistema de procedimiento. De lo contrario, no habría necesidad, ni podría darse una explicación satisfactoria, de la modificación hecha en tales leyes, y el hecho de esa modificación es por sí mismo evidente.

El efecto de estos cambios en lo que al dominio de la corte sobre el ejercicio de la patria potestad se refiere, ha sido reducir la autoridad paterna al mismo nivel general que la de un tutor o defensor.

Sin embargo, esta corte, en un caso reciente, el de *Fuentes* v. *El Registrador,* 24 D.P.R. 619, por voz de su Juez Presidente anterior, se mostró unánime en cuanto al punto envuelto en la siguiente afirmación:

"El artículo 82 de la Ley de Procedimientos Legales Especiales, tal como quedó enmendado por la Ley No. 33 de 9 de marzo de 1911, previene que en cualquier caso en que el juez autorice al representante del menor para algún acto o contrato en que el menor obtenga dinero u otros valores, la resolución determinará la colocación o inversión de lo adquirido y el Fiscal vigilará por los medios que considere adecuados, el cumplimiento de la resolución judicial. En consonancia con ese precepto Gabriel C. Fuentes estará obligado a justificar la inversión de los $900 que recibió por la venta de los condominios que tenían sus hijos sobre la casa subastada por el Márshal de la Corte de Distrito de Humacao; pero no es el Registrador de Caguas el llamado a exigir la justificación de esa inversión sino el Fiscal del distrito."

El registro de la propiedad es una institución para la protección de terceros.

Es deber indiscutible del registrador rehusar la inscripción de un documento que sea fatalmente defectuoso o indicar la existencia de cualesquiera defectos subsanables de que adolezcan los documentos que de lo contrario serían inscribibles. Con su fianza oficial responde de cualquier omisión o negligencia en el cumplimiento de tal deber. El decir que el registrador no puede poner reparos a una es-

critura de enajenación otorgada de conformidad con una autorización judicial para la venta de propiedad perteneciente a menores, por no habérsele demostrado la forma en que ha de invertirse el producido de la venta, significa, en caso de significar algo, que la falta por parte del padre o tutor de invertir nuevamente el dinero como lo exige la orden autorizando la venta, no puede afectar el título de un comprador que se ha desprendido de su dinero al recibo de la escritura de la propiedad en cuestión.

*A fortiori,* en 1895, a falta de tal requisito estatutorio, y en ausencia de una disposición específica en la orden autorizando la venta o enajenación de propiedad inmueble, la responsabilidad para el debido cumplimiento del deber implícito que tenía un padre en relación con la reinversión del producido, el otorgamiento de una hipoteca o la prestación de una fianza para la protección de los menores, difícilmente podría decirse que descansaba sobre los hombros del comprador de la propiedad inmueble así enajenada o sobre los hombros de un comprador de la propiedad traspasada al padre de tales menores con el fin de ser gravada posteriormente en beneficio y para utilidad de ellos.

Toda la historia del presente caso desde la fecha del segundo matrimonio de Amy en el 1883 se encamina hacia ese acontecimiento como factor principal de la situación existente al tiempo de obtenerse la autorización judicial para la venta de las dos propiedades pertenecientes a los hijos del peticionario habidos en su primer matrimonio.

Una de dichas propiedades había sido comprada con el producto de una póliza de seguro de vida después de la muerte de la primera esposa. El título de la otra finca, cuya enajenación se autorizó primeramente, había sido adquirido directamente por herencia. En la demanda del presente caso, al igual que en los pleitos anteriores, los demandantes alegan que han adquirido ambas propiedades por herencia y así las considera y hace referencia a ellas repe-

tidas veces el abogado de los apelados desde que comienza hasta que termina su alegato.

La orden que primeramente se obtuvo autorizaba la venta de una propiedad perteneciente a los hijos del primer matrimonio, la cual adquirieron por herencia de su difunta madre. La petición para la segunda orden fué presentada por Amy siendo ya casado y como padre de los menores en cuestión habidos del primer matrimonio. En ella se solicitaba que se expidiera una orden autorizando la venta de una segunda finca perteneciente a dichos menores, como un incidente del traspaso ya autorizado y como parte de la misma transacción. Bajo estas circunstancias no necesitamos detenernos en este estado del càso para sofisticar acerca del verdadero *status* técnico de la propiedad adquirida con el producto de la póliza de seguro de vida a favor del cónyuge supérstite y de los hijos de una esposa y madre fallecida.

La fraseología de las dos órdenes y de la única petición ante nos debe interpretarse en relación con los hechos que aparecen de la faz de dichos documentos, suplementados, de ser ello necesario, por cualesquiera otros que pueda razonablemente presumirse estuvieron principalmente en la mente del peticionario, del fiscal y del juez, y a la luz de la ley aplicable a tales hechos.

De acuerdo con el contexto del artículo 160 del Código Civil anterior, el padre que tiene la potestad y compañía de un menor es el usufructuario así como el administrador de toda la propiedad adquirida gratuitamente o por cualquier título lucrativo perteneciente a dicho menor.

Los artículos 163, 491 en parte, y 492, leen como sigue:

"Art. 163. Los padres tienen, relativamente a los bienes del hijo en que les corresponde el usufructo o administración, las obligaciones de todo usufructuario o administrador, y las especiales establecidas en la sección 3ª del tít. 5º de la Ley Hipotecaria.

"Se formará inventario, con intervención del ministerio fiscal, de los bienes de los hijos en que los padres tengan sólo la administra-

ción; y, a propuesta del mismo ministerio, podrá decretarse por el Juez el depósito en los valores mobiliarios propios del hijo.''

''Art. 491.    El usufructuario, antes de entrar en el goce de los bienes, está obligado:

⁎   ⁎   ⁎   ⁎   ⁎   ⁎   ⁎

''2º.    A prestar fianza, comprometiéndose a cumplir las obligaciones que le correspondan con arreglo a esta sección.

''Art. 492.    La disposición contenida en el número 2º del precedente artículo, no es aplicable al vendedor o donante que se hubiese reservado el usufructo de los bienes vendidos o donados, ni tampoco a los padres usufructuarios de los bienes de sus hijos, ni al cónyuge sobreviviente respecto a la cuota hereditaria que le conceden los artículos 834, 836 y 837, sino en el caso de que los padres o el cónyuge contrajeren segundo matrimonio.''

Los artículos 157, 168 en parte, y 200 a 206, inclusive, de la Ley Hipotecaria son como sigue:

''Art. 157.    Son únicamente hipotecas legales las establecidas en el artículo 168.''

''Art. 168.    Se establece hipoteca legal:

⁎   ⁎   ⁎   ⁎   ⁎   ⁎   ⁎

''2. En favor de los parientes a que se refiere el artículo 811 del Código Civil, por los bienes que declara reservables, sobre los del obligado a reservarlos; y en favor de los hijos sobre los bienes de sus padres, por los que éstos deban reservarles según las leyes, y por los que pertenecen a dichos hijos mientras están bajo la patria potestad del padre o madre, en el caso de que éstos contrajeren segundo matrimonio.

''3. En favor de los herederos del cónyuge premuerto, sobre los bienes del sobreviviente, por la cuota hereditaria que corresponde usufructuar a éste según la ley, en el caso de que para tal objeto pasen a su poder bienes determinados, siempre que contrajere segundas nupcias.''

''Art. 200.    El padre, o en su defecto la madre, son los administradores legales de los bienes de los hijos que están bajo su potestad, aunque con la obligación de constituir hipoteca legal en favor de los últimos cuando contrajeren segundas nupcias.

''Art. 201.    Los hijos a cuyo favor establece el artículo anterior hipoteca legal, tendrán derecho:

''1. A que los bienes inmuebles de su pertenencia se inscriban a su favor, si ya no lo estuviesen.

"2. A que su padre, o en su caso su madre, asegure con hipoteca especial, si pudiere, los bienes que no sean inmuebles pertenecientes a los mismos hijos.

"Art. 202.    Se entenderá que no puede el padre, o en su caso la madre, constituir la hipoteca de que trata el artículo anterior, cuando carezca de bienes inmuebles hipotecables.

"Art. 203.    Si los bienes inmuebles que tuviesen los padres fuesen insuficientes, constituirán, sin embargo, sobre ellos la hipoteca, sin perjuicio de ampliarla a otros que adquieran después, en caso que se lo exijan.

"Art. 204.    Podrán pedir, en nombre de los hijos, que se hagan efectivos los derechos expresados en el artículo 201:

"1. Las personas de quienes procedan los bienes.

"2. Los herederos o albaceas de dichas personas.

"3. Los ascendientes del menor.

"Art. 205.    El padre, o la madre en su caso, no podrán enajenar los bienes inmuebles del hijo en que les corresponda el usufructo o la administración, ni gravarlos, sino por causas justificadas de utilidad o necesidad y previa la autorización del juez del domicilio, con audiencia del ministerio fiscal.

"Art. 206.    En caso de que las personas mencionadas en el artículo 204 no pidan que se hagan efectivos los derechos expresados en el 201, podrá el fiscal solicitarlo de oficio."

Después de la muerte de la primera esposa, y a menos y hasta que el cónyuge supérstite contrajera segundas nupcias, no estaba bajo obligación legal alguna de prestar fianza para la debida dirección, cuidado y administración de la propiedad perteneciente a sus menores hijos, pero que estaba bajo su custodia y dominio como administrador y usufructuario. Los únicos bienes que poseía Amy Pareñó al tiempo de su segundo matrimonio aparentemente consistían de cinco o seis parcelas de terreno en Aguamanil y que ascendían en conjunto a un área aproximadamente igual a la de las dos propiedades pertenecientes a sus menores hijos en Jobos. Cualquier propiedad parafernal de la primera esposa que le fuera entregada, de haberle entregado alguna, parece haberse perdido ya. Refiriéndose a una situación algo parecida, la Corte Suprema de Louisiana, en el caso de *Cleveland* v. *Sprowl*, 12 Rob. 172, dijo:

"Puede tratarse de una situación difícil; y quizás como hombres deberíamos estar dispuestos a simpatizar con los sentimientos expuestos por uno de los abogados del apelante en su alegato y al mismo tiempo deplorar la situación de un pobre huérfano cuya herencia ha sido dilapidada por su padre, y que ha quedado sin remedio alguno al fallecimiento de éste. Pero tal es la ley. Como jueces, estamos obligados a obedecerla; y no nos sentimos autorizados 'para forzarla un poco' como sugiere el abogado, aun cuando ello sea en bien de la justicia."

Véanse además los casos de *Handy* v. *Parkison,* 10 La. 92 y *State of Louisiana* v. *The Judge of the Parish of Orleans,* 6 La. 363.

El juez de primera instancia sabía que Amy Pareñó, como administrador y usufructuario de los réditos derivados de la venta de la propiedad de Jobos, no estaría sujeto a restricción o limitación en el uso o disposición que de los mismos hiciera, más allá de la obligación impuéstale por la ley de otorgar una hipoteca a favor de sus menores hijos sobre la propiedad inmueble de que era entonces dueño, o que él adquiriera posteriormente. La corte sabía que esta obligación, si no se cumplía voluntariamente, podía hacerse cumplir, o era de presumirse que así lo fuera, de serlo, sólo por el albacea testamentario de la esposa fenecida o por ciertos y determinados parientes, o, de lo contrario, como último resorte, y a falta de la actuación de cualquiera de dichas personas, por aquellas medidas que el fiscal estuviera obligado a adoptar.

Quizás el otorgamiento de una hipoteca sobre los bienes inmuebles ya pertenecientes al peticionario pudo haberse establecido como un requisito previo para la enajenación de la propiedad en cuestión.

Posiblemente pudo haberse hecho alguna disposición en cuanto a la custodia judicial de los réditos pendientes de reinversión. Pero, a decir lo menos, es dudoso que se encuentre un precedente en los anales de la jurisprudencia española para tales medidas de precaución en un caso de

esta naturaleza. En verdad, no hay la indicación más remota de tal condición precedente en parte alguna de los procedimientos que culminaron en la venta de la finca que ahora está en controversia. Ni siquiera se le ocurrió a la corte de Guayama exigir el otorgamiento de una hipoteca sobre la propiedad que iba a ser adquirida por Amy al tiempo de tal adquisición o posteriormente. El juez, empapado del espíritu de los varios códigos en vigor en aquel tiempo, y depositando entera fe y confianza en la conciencia paterna y en el natural cariño y afecto de un padre para con sus hijos, puso el cumplimiento de los deberes y obligaciones impuestas por la ley a Amy Pareñó, enteramente sobre él de acuerdo con las disposiciones generales de dicha ley. Bajo tales circunstancias, el decir que el traspaso a Verges ni siquiera tenía la apariencia de un contrato suficiente para poner en movimiento la prescripción de cuatro años dispuesta por el estatuto, envolvería una extensión única, así como una drástica aplicación de la regla de *caveat emptor.*

Hubo, desde luego, el entendido implícito de que Amy Pareñó adquiriría una propiedad mayor y de más valor, colindante con la que ya poseía en Aguamanil, y "de esa manera," o a lo sumo, y en adición a tal adquisición, procedería en la forma prescrita por la ley, "para afianzar lo que pertenece exclusivamente a sus citados hijos, con mucho más valor y aumento de los que hoy tienen los que pretenden vender." Pero no puede hallarse insinuación alguna del propósito de siquiera exigir tal garantía en la parte dispositiva de cualquiera de las dos órdenes en cuestión. La autorización para la venta de la propiedad que ahora se trata de reivindicar fué incondicional y sin restricciones.

Que éste fué entonces el entendido de todas las partes interesadas y por muchos años después, lo demuestran terminantemente la estipulación contenida en el documento privado de igual fecha que las dos escrituras otorgadas en

1895; la mención de una obligación a este respecto por parte de Amy en el asiento hecho por Verges en el libro diario; el otorgamiento posterior de hipotecas a favor de los hijos menores, los ahora demandantes, sobre todas las propiedades de que era dueño Amy Pareñó, incluyendo la traspasada por él a Verges; la aceptación por los demandantes de dinero entregádoles en pago y saldo de una o más de tales hipotecas; la aceptación por los demandantes del traspaso de un número de propiedades más pequeñas de que era dueño Amy Pareñó, en pago y satisfacción de la obligación para el afianzamiento de la cual se constituyeron tales hipotecas; y la teoría de las dos acciones primeramente entabladas contra Amy Pareñó y Mateo Amorós, en las cuales los demandantes trataban de establecer la superioridad de la segunda hipoteca constituída a su favor por Amy Pareñó sobre la propiedad adquirida de Verges, sobre un gravamen anterior de igual naturaleza, igualmente creado por Amy Pareñó a favor de Amorós Hermanos.

No creemos necesario por ahora discutir la doctrina de elección de remedios o elaborar detalladamente las circunstancias tendentes a establecer la teoría de ratificación alegada por los demandados como defensa especial. Basta decir que la cuestión de ratificación *vel non* no depende de la cantidad de dinero o terreno recibida y aceptada por los demandantes, y que la doctrina de aplicación de pagos no está envuelta, o que, de estarlo, no es un factor dominante en las circunstancias de este caso.

La finca de Jobos valía aproximadamente 3,000 *pesos* en la moneda entonces circulante. Durante la minoridad de los demandantes esta suma no devengó intereses. Las cinco fincas traspasadas a los demandantes por Amy Pareñó en 1906 por convenio mutuo tenían un valor de $2,500 y fueron aceptadas por esa suma en pago parcial o reembolso de determinada porción de la herencia que parece razonablemente estar identificada como la partida representada en parte por la finca Adela. Al cancelarse la hipoteca sobre

la parcela de 50 cuerdas que había pasado a otras manos, los demandantes, en 1910, reconocieron haber recibido de Amy Pareñó con anterioridad a esa fecha la suma de $1,500, siendo ésa la cantidad garantizada por dicha hipoteca. La corte inferior expresamente llegó a la conclusión de que el valor de la finca Jobos estaba incluído en la suma total para cuyo afianzamiento Amy constituyó una hipoteca sobre todas sus propiedades en 1895. En el caso de *Amy* v. *Amy,* 15 D.P.R. 415, esta corte resolvió que la mera admisión de Amy Pareñó no era suficiente para establecer el hecho de que había recibido la propiedad parafernal de su primera esposa, cuyo valor representaba la mayor parte de la obligación garantizada por la hipoteca. De ser correcta tal contención, entonces los demandados en el presente caso tienen derecho al mismo albergue y comodidad que los que Mateo Amorós recibió de ellos en el pleito anterior. Pero fuera de tal admisión, no hay prueba en el presente caso de que Amy Pareñó jamás recibió propiedad alguna perteneciente a los demandantes, a no ser la que podría considerarse como perteneciente a ellos por razón de la enajenación de las 80 cuerdas traspasadas a Verges.

Es bueno añadir que la demandante Carmen Amy Ramú era menor de edad tanto en 1910 como en 1906. En 1906 estaba representada por José Lorenzo Castillo, esposo de Josefina, y en 1910, por su padre Amy Pareñó.

Otro aspecto interesante del presente caso es la breve historia de la propiedad traspasada por Verges a Amy Pareñó después de la ejecución de la hipoteca de Amorós. En febrero de 1910, Luis Francisco Verges, con el fin de proteger los intereses de los demandantes o por lo menos, los de Josefina, Carmen y Dolores Amy y Ramú, compró la finca Trinidad por la cantidad de $10,000 oro americano, a los postores a quienes les había sido adjudicada en la venta para la ejecución de la hipoteca, y entregó la posesión de la misma a Josefina y su esposo, José Lorenzo Castillo, de acuerdo con las condiciones enumeradas en una

carta a Josefina de fecha 12 de marzo de 1910, que en substancia son como sigue:

Castillo y su esposa pagarían mil dólares anuales y las contribuciones como canon de arrendamiento, y percibirían todos los beneficios derivados de su administración de la finca. Ellos tenían que sufrir cualquier pérdida que se ocasionara. El canon anual se les acreditaría como plazo del precio de la compra de la finca por vía de reembolso por un período de diez años, sin intereses. Estos pagos serían acreditados a la cuenta de Josefina, Dolores y Carmen, con el entendido de que al expirar los diez años la propiedad les pertenecería. Al. fallecimiento de Josefina, terminaría el arrendamiento, pero su participación como condueña pasaría a sus hijos. De morir Castillo, se vencería igualmente el arrendamiento, ínterin se hiciera un reajuste en el cual, en caso de diversidad de criterio, prevalecería el de Verges. En caso del fallecimiento de Dolores o Carmen, los derechos de cualquiera de ellas o de ambas volverían a recaer en Verges, quien podía disponer de ellos según creyera conveniente. A la muerte de Verges, sus herederos actuarían de acuerdo con sus intenciones en la forma indicada, o bajo condiciones más favorables, y en ningún caso menos favorables, para las tres hermanas.

En resumen, la carta expresa el deseo de que las hermanas estuviesen protegidas en cuanto fuese posible, y debían adquirir eventualmente la finca Trinidad y disfrutar de ella, y en caso de muerte, se evitaría en todo lo posible que la propiedad pasara a otras manos.

En noviembre del mismo año, Luis Francisco Verges otorgó testamento en el cual, después de hacer varios legados, dejó el resto de sus bienes, incluyendo la finca Trinidad, a la esposa de Eugenio Marcelino Verges, y dejó de existir poco después.

En agosto de 1911, Eugenio Marcelino Verges, como mandatario y apoderado de su esposa, traspasó la Trinidad a Josefina, Carmen y Dolores Amy Ramú. Al tiempo de

este traspaso, Carmen tenía 21 años de edad. La escritura hace referencia a la carta del 12 de marzo de 1910, así como a un convenio a que se llegó con respecto al otorgamiento de una escritura en consideración a la cantidad mencionada en dicha carta, pero de acuerdo con los términos y condiciones que más tarde se expresarían en el mismo documento,—no, como resolvió la corte inferior, por una suma que sería pagada en plazos anuales. La consideración que se especifica posteriormente es la suma de $10,000 que se reconoce haberse recibido con anterioridad a la fecha del otorgamiento de la escritura, y esta afirmación queda además explicada por la manifestación adicional de que Luis Francisco Verges había admitido el hecho del pago en la forma indicada en su referido testamento. No se presentó el testamento durante el juicio. Pero Josefina Amy y Ramú declaró como testigo de los demandados que sólo se había pagado el primer plazo del arrendamiento, y que la propiedad había llegado a poder de ella y de sus hermanas como un regalo.

Enrique Amy Pareñó falleció en febrero de 1912.

Luis Francisco Verges no compró la "Trinidad" con el fin de restituir a los demandantes el título legal de la misma. Tal título lo tenía Amy Pareñó, y no los demandantes, al tiempo del procedimiento ejecutivo hipotecario. La tendencia general de la carta arriba mencionada indica más bien la intención de proteger los intereses representados por la segunda hipoteca sobre la propiedad en cuestión hasta el límite de cualquier margen del valor efectivo que pudiera haber en exceso de la suma de diez mil dólares. Esa carta no imponía obligación alguna a la esposa de Eugenio Marcelino Verges como legataria, y mucho menos a su esposo como mandatario y apoderado de ella, de transferir la Trinidad en condiciones más favorables que las allí especificadas. Aunque los demandantes eran todos mayores de edad al tiempo de este traspaso, no se le ocurrió a ninguno de ellos investigar la validez o regularidad de

los procedimientos que culminaron en la adquisición por los demandantes de cualquier interés en equidad o en derecho que ellos pudieran haber tenido sobre la propiedad que les iba a ser traspasada. Si tuvieron alguna duda en cuanto a la validez del título que Verges había tenido por más de quince años, con anterioridad a aquella fecha, guardaron discreto silencio.

No fué sino mucho después que Eugenio Marcelino Verges como mandatario y apoderado de su esposa, había renunciado al pago de $9,000 en pagos diferidos, como condición precedente al traspaso de la Trinidad, hasta mucho después que los labios tanto de Verges como de Amy Pareñó habían sido sellados por la muerte, y hasta que la acción ordinaria de nulidad había prescrito por el transcurso de más del doble del período estatutorio, desde que el menor de los demandantes había llegado a su mayoridad, e incidentalmente hasta mucho después de dictarse la decisión de la Corte Suprema de los Estados Unidos en el caso de *Longpré* v. *Díaz,* 237 U. S. 512 y la de este Tribunal en el caso de *Del Rosario* v. *Rucabado,* 23 D.P.R. 473, que se entabló el presente litigio. Bajo las circunstancias, y en ausencia del testamento de Luis Francisco Verges, no necesitamos especular en cuanto al límite hasta el cual hubiese quedado obligada la esposa de Eugenio Marcelino Verges por cualquier disposición en dicho documento con respecto al pago de tales plazos diferidos, no obstante el hecho incontrovertible de que jamás se hizo tal pago. Véase, sin embargo, *Pagán et al.* v. *Sellés et al.,* 29 D.P.R. 821.

Es bueno recordar que el valor tasado de la "Adela," así como el de la "Trinidad" en 1895, lo era en *pesos* provinciales españoles, y que cualquier dinero o propiedad que recibieron los demandantes después del cambio de soberanía lo fué en oro americano o su equivalente. No hay nada que demuestre que la Trinidad produjera en la venta de ejecución más del tanto por ciento corriente del valor real, ni de que el comprador en tal venta obtuviera una ganancia en la transacción al disponer prontamente de la propiedad

por $10,000. José Lorenzo Castillo y su esposa estaban bastante satisfechos con pagar $1,000 anualmente y las contribuciones como canon de arrendamiento y con asumir cualquier riesgo envuelto en esta aventura que se extendió por un período mayor de diez años. Los desastrosos resultados del ciclón de 1899 y los efectos inmediatos del cambio de soberanía sobre la industria de café, en notable contraste con el rápido aumento en valor de los terrenos costaneros propios para caña que siguió a la ocupación americana, son materias de historia local y de conocimiento general. No hay, por tanto, nada de asombroso en el hecho, si ello fuera un hecho, de que la "Trinidad" había depreciado algo en valor antes de que el título legal a la misma finalmente pasara a los hijos de Amy o de que en el ínterin la "Adela" llegara a valer muchas veces más de la suma en que fué tasada un cuarto de siglo antes de entablarse la presente acción.

Tales circunstancias pueden servir para explicar el descontento de los demandantes con respecto a las condiciones existentes, pero ni estos cambios radicales ni los acontecimientos que los provocaron pudieron ser previstos por un observador ordinario en 1895, y no puede presumirse que estuvieran en la mente de cualquiera de las partes interesadas en aquel entonces.

En abril de 1918, Enrique Amy Ramú vendió y traspasó a sus hijas Josefina, Dolores y Carmen su condominio proindiviso de una cuarta parte de las cinco parcelas de terreno adquiridas de Amy Pareñó en 1906. Más tarde, estas parcelas fueron agrupadas con la Trinidad e inscritas en el Registro de la Propiedad como una sola finca. Después de esto, la finca últimamente mencionada fué dividida en tres partes, distribuyéndose entre las tres hermanas.

Es casi incuestionable que los demandantes tuvieron pleno conocimiento de todos los hechos en que ahora descansan desde la fecha en que se entablaron los pleitos anteriores contra Amy y Mateo Amorós. La demanda en este caso,

que designa a los herederos de Eugenio Marcelino Verges
y Lapelleux como demandados, está fechada en septiembre
27, 1921, y de acuerdo con los autos ante nos, fué archivada
en la corte de distrito el 27 de septiembre de 1920. Los
demandados alegaron no sólo ratificación y la existencia de
impedimento por elección de remedios, sino la prescripción
estatutoria de cuatro años fijada para acciones de nulidad
por el artículo 1268 del Código Civil.

Los apelados consistente y tesoneramente se agarran de
la teoría de una substitución de garantías por la obligación
personal de Amy Pareñó como el fundamento principal
para la absoluta nulidad en que ellos insisten, y dicen:

"El extremo. que interesa sentar no es si Verges podía, o no, re-
cibir una suma, o dar otra, si pensó en dejar tal o cual cantidad, a
beneficio de los menores, o si era en nombre de generosos procede-
res; el punto que interesa al Tribunal es si a los hijos menores de
Enrique Amy y Pareñó tocaba garantizar la deuda de éste con
Verges; que si la autorización judicial se hubiera pedido para que
los menores garantizaran la deuda paterna, para la comodidad y
mejor seguridad de Verges, seguramente no se hubiera encontrado
un juez que autorizara una monstruosidad semejante. Lo que in-
teresa es que se pidió autorización para vender los bienes, y así se
obtuvo; y en vez de vender, se pusieron los bienes en garantía de
la deuda paterna; y se simuló una venta, y se hizo una escritura
falsa y fraudulenta;  y los hijos perdieron sus bienes, sin ven-
derlos.

"Nuestra tesis es ésta.  Los menores no podían prestar consenti-
miento para la venta, ni para otro contrato.  Ese consentimiento
tenía que prestarse por el padre.  Pero éste no podía hacerlo sin la
autorización judicial; la pidió para vender, y para vender se le dió.
Y, separándose de la autorización, convirtiéndola en su propia uti-
lidad y beneficio, no vendió, sino que garantizó su propia deuda.  Y
como no vendió, que era para lo que estaba autorizado, no consintió
por los menores.  Y si no consintió, no hubo contrato."

La corte inferior, al interpretar las disposiciones preli-
minares de las órdenes autorizando la venta, las cuales no
estuvieron ante este tribunal en la apelación anterior, con-
sideró la conclusión a que se llegó entonces, que estaba ba-

sada en las alegaciones de la demanda, como decisivas de la cuestión presentada por la evidencia que se adujo en el juicio, aunque el juez sentenciador es algo más conservador y, hasta ese punto, más digno de aplauso que el abogado de los apelados, tal como lo demuestra el siguiente extracto de la "Relación del Caso y Opinión" en que se basó la sentencia apelada:

"Como ya expusiéramos, el permiso concedido a Amy fué para comprar a favor de sus hijos y con tal compra afianzar, pero no afianzar en bienes particulares de la propiedad de su padre, el importe de bienes vendidos, pues con ello, lejos de beneficiarse los menores, salían perjudicados, cambiando derechos de dominio por derechos reales más o menos efectivos.

"Y siendo esto así, hay que convenir en que Amy Pareñó no cumplió con la orden del Juzgado de Primera Instancia de Guayama.

"La cuestión legal de si tal falta envuelve la nulidad o la inexistencia del contrato de 12 de marzo de 1895 es un punto resuelto ya a nuestro juicio por la Corte Suprema de Puerto Rico, quien por conducto de su Hon. Juez Sr. Adolph G. Wolf y al resolver las excepciones previas propuestas contra la demanda, cuestión que fué objeto de apelación ante dicho Tribunal, se expresó del modo siguiente:

" 'En su capacidad representativa como padre de los demandantes el referido Amy sólo tenía derecho a vender la indicada finca por una causa que pasa a sus hijos o a él mismo como su representante. Él no tenía derecho a vender la propiedad por una causa que se admite se trasmitió a él exclusiva y personalmente. No dudamos de la actual buena fe de Amy o Verges, pero cuando Amy obtuvo autorización judicial para la venta de la propiedad a fines de utilidad y necesidad y entonces la traspasó en garantía de una deuda suya, se engañó a la corte y se perpetró un fraude contra los herederos menores.

" 'Amy no podía, en su capacidad representativa, cancelar la obligación principal o sea su misma deuda mediante un traspaso de la finca de sus hijos que no obtuvieron ningún beneficio. La corte de distrito declaró que era válido el contrato y a la vez que la acción para su nulidad había prescrito. El contrato era inexistente y todos los hechos que constituyen su absoluta nulidad eran conocidos de todas las partes.' "

La proposición de que "el permiso concedido a Amy fué para comprar a favor de sus hijos,"—si con ello se quiere decir que a ellos se les había de designar como cesionarios en la escritura de enajenación o que la propiedad recientemente adquirida iba a ser traspasada a Amy Pareñó como representante legal de sus menores hijos y expresamente a favor de ellos—no está sostenida por tal frase o su equivalente, ni en la materia inductiva contenida en cualquiera de las órdenes permisivas en cuestión o en la única petición para tal autorización judicial ahora disponible como una ayuda para la interpretación. En verdad, la cuidadosa omisión de tal manifestación en la referida solicitud es demasiado conspicua para haberse escapado de la atención de cualquier fiscal o juez que considerara necesaria la inclusión de tal disposición para proteger a los menores al cuidado y custodia de su padre, o adecuada en tales circunstancias de acuerdo con las leyes vigentes en aquel tiempo.

Las dos órdenes no sólo se basaron en la petición de Amy Pareñó, sino que también, y en primer término, sobre hechos que se desprendían de las declaraciones de testigos. La petición expresamente se refiere a una transacción ya arreglada o convenida con Eugenio Marcelino Verges, según la cual se aumentaría considerablemente el valor de la propiedad que estaba por venderse. El propósito del peticionario, claramente expresado en la petición, era adquirir otra propiedad colindante con, o contigua a, la que ya él poseía, no sus hijos menores, en Aguamanil, aumentando así el valor de la propiedad a que se ha hecho mención últimamente. Este aumento en valor de la propiedad de que era ya dueño Amy Pareñó, no sus menores hijos, era lo que "en su día" redundaría en beneficio de dichos menores, más bien que en beneficio de cualquiera otra persona. Se dijo en la petición que algunos testigos declararían sobre el hecho de que la propiedad que se iba a vender no valía más que la cantidad en que se había com-

prado, y que por virtud del convenio pendiente con Verges, se aumentaría el valor de la misma. Esta es la razón en realidad la única razón, señalada por el peticionario para la conclusión a que llegó y que sometió a la corte, al efecto de que la enajenación en perspectiva sería aconsejable y ventajosa para los menores.

Ante esta franca exposición de un fin o propósito determinado, en unión de la referencia específica a los arreglos ya convenidos para efectuar el plan propuesto, así como la revelación deliberada de la identidad del individuo con quien se había acordado tales arreglos, no ha de presumirse fácilmente que Amy Pareñó y Verges se perjuraran o suprimieran cualquiera de los hechos esenciales, circunstancias o detalles envueltos en el convenio sometido a la corte para su aprobación. Aparentemente, ellos eran los únicos testigos en cuanto a estos extremos entonces disponibles, y no tenemos motivo alguno para asumir que ninguno de ellos ocupara la silla testifical. Por el contrario, ambas órdenes proclaman que, "la certeza de la conveniencia de la venta de que se trata" se acreditó por la declaración de testigos que declararon durante el juicio, y la resolución del 20 de diciembre agrega "por ser beneficioso para los menores." La primera de las dos resoluciones indica que la prueba aducida durante la vista demostró que la propiedad que iba a ser vendida no valía más de 1,500 *pesos,* y que "por efecto de la negociación para la compra de otros (terrenos) colindantes a la hacienda de café ya mencionada," alcanzarían un valor de 3,500 *pesos.* Estas conclusiones a que se llegó en julio de 1893 anticipaban en forma general los asientos hechos por Verges en marzo de 1895 al consumarse la negociación a que hicieron referencia los testigos y el juez de primera instancia. Y la otra conclusión respecto a la "utilidad" de la enajenación propuesta la basó el juez de primera instancia directamente sobre este aspecto del negocio que estaba pendiente entre Amy Pareñó y Verges. Estas con-

clusiones deben interpretarse en relación con la manifestación precedente contenida en la orden respecto al propósito de Amy Pareñó de adquirir otra propiedad colindante con la que ya poseía en Aguamanil, garantizando en esta forma oportunamente los intereses de sus menores hijos. Interpretadas en este sentido, no puede resolverse que impliquen que el título de la propiedad recientemente adquirida recayera directa e inmediatamente en los menores como condición precedente a la consumación de la propuesta transacción. En conjunto, esa transacción envolvía la enajenación de una propiedad que valía aproximadamente 3,000 *pesos,* a cambio de otra que se decía valer entonces 30,000 *pesos.* Según lo demuestra la última conclusión que acabamos de mencionar, y según lo demuestran acontecimientos posteriores que están más o menos en armonía con dicha conclusión, a los menores se les acreditaba una suma aproximadamente igual al doble del valor de la finca de Jobos, la que sería garantizada en su día en forma adecuada por el padre. La idea de que el padre tuvo la intención de adquirir directamente para los menores y a nombre de ellos una propiedad cuyo valor era diez veces mayor que el de la que ya les pertenecía y que iba a ser enajenada, está enteramente en conflicto con el propósito del padre, al adquirir una finca mayor, de aumentar el valor de las propiedades ya poseídas por él, y garantizar así en su día los intereses de tales menores. La adquisición de tal finca de mayor extensión directamente para los menores y a nombre de ellos no solamente duplicaría el valor de la propiedad ya poseída por ellos, según lo tuvo en mente el juez que autorizó el traspaso, ni simplemente garantizaría "lo que pertenecía exclusivamente a sus citados hijos, sino que decuplicaría los intereses anteriores y obviaría la necesidad de prestar garantía por la substitución del completo y absoluto dominio de la propiedad recibida a cambio de lo que hasta entonces había pertenecido exclusivamente a dichos menores. En lo que a Verges concernía,

el resultado fué una mera permuta. El se deshizo de una propiedad y adquirió otra. Pero desde el punto de vista de Amy Pareñó y sus hijos, la situación era muy distinta. El título legal de la finca de Jobos pertenecía a los menores; el usufructo, al padre. Los menores habían de desprenderse de su título legal, y el padre, de su usufructo. A fin de compensar a los menores por la pérdida de su título, el padre tenía que asumir una obligación montante al doble del valor de la finca de Jobos, y en su día, prestar la garantía correspondiente para el cumplimiento de su obligación. El contexto de la segunda orden, rigiéndose por el de la petición, al exponer el fin del doble traspaso propuesto, deja poco lugar a dudas en cuanto a este respecto. Si la corte o las partes en la transacción propuesta hubiesen tenido en mente un cambio de títulos y nada más, entonces no habría habido necesidad de la elaborada explicación respecto a cómo el valor de la propiedad que ya pertenecía a los menores iba a ser aumentado, o de limitar la cantidad de tal aumento al 100 por ciento de ese valor, o de dar a la transacción la forma de una doble venta. Y si el plan de la doble venta era indispensable o no, o si de todos modos era o no adaptable con el fin de llevar a efecto lo proyectado, es cuestión que no nos concierne, en ausencia total de algo que indique la intención de parte de Amy Pareñó o de Verges de tergiversar los hechos o de engañar a la corte, y a falta de algo que demuestre que la corte fué en realidad engañada, ya fuera intencionalmente o en alguna otra forma. Tampoco puede alegarse con éxito que el recurrir a un doble traspaso en forma de una doble venta, como mera cuestión de conveniencia, es un indicio de fraude, cuando tanto la corte como el fiscal estaban enteramente al corriente de todos estos hechos. La circunstancia a que da énfasis el juez sentenciador en el presente caso, de que Amy Pareñó se refirió en su petición al pequeño grupo de fincas entonces poseídas por él como la "Trinidad," es igualmente inadecuada para crear confusión

en una mente despejada.   El hecho de que el dueño de una pequeña parcela de terreno llamada la "Trinidad" diera el mismo nombre a un predio colindante de mayor extensión, al adquirirlo, no constituye un fundamento satisfactorio de sospecha ni un motivo adecuado de aturdimiento.

En lo que se refiere a los menores, según hemos dicho ya, la .causa (*consideration*) fué la obligación asumida por el padre que representaba una cantidad del doble del valor de la propiedad que iba a ser enajenada, juntamente con la enormemente aumentada responsabilidad financiera y la habilidad aparente del padre de prestar la garantía adecuada para el cumplimiento de esa obligación, así como la expectativa razonable de que prontamente procedería a cumplir con los deberes impuéstoles por la ley vigente.   De ahí la estipulación a que llegaron Amy y Verges, contenida en el documento privado de igual fecha, al efecto de que Amy se entendería con sus hijos, no como erróneamente se tradujo en 15 P.R.R. 399, "para el traspaso legal a ellos de la propiedad," (*"for the legal transfer to them of the property,"*) sino "para transferir su propiedad de una a la otra estancia en forma legal."   De ahí además la perfecta compatibilidad entre las otras dos manifestaciones que de lo contrario serían enteramente irreconciliables hechas por Verges en los asientos del libro diario, *supra*.   En el primero de estos asientos, Verges, considerando la cuestión como una transacción entre él y Amy, habla de ella como un mero cambio de propiedades.   Pero el párrafo final del segundo asiento hecho al mismo tiempo, descubre el verdadero aspecto de la transacción, como que se efectuó entre Verges y "los hijos de Tututa:"

"E. M. Verges, Cuenta Capital.  Por rebaja en estimación que hago en la cuenta de Amy por virtud de esta transacción siendo este sacrificio a favor de los hijos menores de Tututa y debe su padre afincar en la finca de café en Guamaní, $3,467.86.   (Total) $6,667.86."

No es respuesta a este aspecto de la situación decir que Amy Pareñó no podía entrar en tal convenio con sus hijos, por la sencilla razón de que ellos estaban representados directamente por la corte, de la cual el padre había solicitado autorización judicial para el traspaso en perspectiva, autorización que necesariamente envolvía e incluía la aprobación y aceptación de la causa en cuestión. El tiempo, la manera y el método en que esta obligación principal iba a ser garantizada, habiendo sido dejados por la corte enteramente a Amy Pareñó, con sujeción únicamente a los principios generales y a las disposiciones de la ley, cualesquiera irregularidades o defectos de la hipoteca que él constituyera posteriormente no podían tener efecto retroactivo para hacer que el título que ya pertenecía a Verges fuera absolutamente nulo.

O, asumiendo para los fines de la argumentación la bondad de la teoría en que insisten los apelados, de que el traspaso original de la "Trinidad" en 1886 no era otra cosa que una especie de venta con pacto de retro (*Welsh mortgage*), entonces el levantamiento de esa garantía en 1895 y la aceptación por parte de Verges de la propiedad de Jobos en completo pago y satisfacción de la obligación de Amy con él, podría considerarse como equivalente a una cesión en equidad de tal deuda, lo que constituiría una causa proveniente de Verges a los menores hijos de Amy Pareñó, quienes en un caso dado, como resultado de tal transacción, bien fuera por cesión o subrogación, quedarían más tarde substituídos en lugar de Verges.

Por tanto, no necesitamos, como ya hemos indicado, detenernos a discutir la doctrina más o menos dudosa de elección de remedios, ni basar nuestra decisión, como en casos anteriores de esta naturaleza, directamente sobre cualquier ratificación implícita por parte de los demandantes de la transacción en que estaba envuelta la enajenación de su propiedad. No obstante, la prueba aducida por los demandados en apoyo de su defensa sobre este fundamento,

ha suministrado una base mejor sobre la teoría de ratificación que la que fué sentada en algunos casos anteriores, como por ejemplo, el de *Torrellas* v. *Santos et al.*, 34 D.P. R. 90, en que la mayoría de los jueces de esta corte a su vez llegó a la conclusión de que "la prueba sobre la confirmación o ratificación era más robusta que en el caso de *Díaz Llenza* confirmado recientemente por la Corte de Circuito de Apelaciones, Primer Circuito, 285 Fed. 132."

Para los fines de esta opinión puede admitirse, sin que lo resolvamos, que al llegar a su mayoridad y dentro de los cuatro años subsiguientes, los demandantes pudieron haber presentado una acción de nulidad, no obstante la autorización judicial que no imponía restricción alguna para la enajenación de su propiedad. Pero la sentencia dictada por la corte inferior en la presente acción reivindicatoria debe sostenerse o revocarse en virtud de la proposición de que la enajenación en cuestión no sólo era anulable sino enteramente nula. Esa proposición descansa a su vez primero, sobre la teoría de una substitución de garantías, y, segundo, sobre la hipótesis alternativa de una falta absoluta de causa. La primera de estas dos contenciones es enteramente insostenible. La segunda es algo más plausible, pero, igualmente, como hemos demostrado, carece de fundamento.

No necesitamos disculpar al fiscal y el juez de primera instancia de Guayama por haber dejado de prever y anticiparse en 1895 la posibilidad de una substitución por Amy Pareñó de una segunda hipoteca por un primer gravamen sobre la propiedad que iba a ser adquirida de Verges. No perdonamos indiferencia alguna por parte del juez y del fiscal al defender los mejores intereses y el bienestar de los menores, si tal indiferencia puede razonablemente inferirse de la omisión de un requisito del otorgamiento de una primera hipoteca sobre tal propiedad como condición previa para que el título de la finca de Jobos pasara a Verges. A falta de tal requisito, el que posteriormente Amy Pareñó

dejara de prestar la garantía correspondiente para el cumplimiento de la obligación asumida por él fué a lo sumo una falta parcial de causa, y no una ausencia total de causa. Pero aún si no hubiese existido causa, según se interpreta esa palabra por la jurisprudencia americana y británica, habría amplio campo para una disquisición sobre posibles distinciones que habría que hacer entre la causa buena, suficiente y de valor (*good, sufficient and valuable consideration*) del derecho común y la "causa" del contrato de la Ley Civil.

Las dos órdenes autorizando la venta siguen la fraseología de la petición presentada por Amy Pareñó. La palabra "enajenación" sólo se usa una sola vez. Pero no aparece que la petición fuera redactada por el peticionario, y no hay presunción alguna de que así lo fuera. Por el contrario, una disposición de la hipoteca constituída posteriormente por Amy a favor de sus menores hijos explica los dos procedimientos distintos; uno en relación con cada una de las dos parcelas de terreno pertenecientes a dichos menores, como que se debió al hecho de que el asunto había sido confiado a un amigo o a otro representante, quien, debido a una mala interpretación, dejó de incluir una de las dos propiedades en la petición original. Incidentalmente, Amy hace mención de su falta de familiaridad con los detalles de forma y procedimiento en tales materias como una de las razones que tuvo para poner el asunto en manos de un mandatario. Pero si la idea de una doble venta como la forma legal adecuada a que debía reducirse la transacción, se originó en la mente de Amy o si fué el plan artificial de algún principiante en la materia, poseído de un concepto estrecho de las posibilidades latentes envueltas en la adaptación a las circunstancias de fórmulas estereotipadas de traspaso, no es cuestión de gran importancia. No se recurrió a la propuesta forma de traspaso, si ésta no se adaptaba al fin perseguido, como un antifaz para ocultar una conspiración y un fraude a la corte, sino que la misma

era, a lo sumo, una forma poco hábil de cumplir un propósito descubierto y claramente definido.

La teoría de la corte inferior de que el juez de primera instancia tuvo en mente un traspaso directamente a los menores o a Amy Pareñó, a nombre de ellos, como representante legal, no sólo envuelve la interpolación de semejante disposición en las dos órdenes que constituían la autorización judicial, sino que es claramente incompatible tanto con el tenor general y el efecto de dichos dos documentos y con todo detalle que en alguna forma se relacione con la cuestión de tal intención.   Bajo las circunstancias de este caso, resolver que el traspaso a Verges era absolutamente nulo sencilla y únicamente porque no fué una venta en el sentido estricto y técnico de la palabra, de acuerdo con la teoría de que la autorización judicial para una venta excluyó la idea de otra clase o forma de enajenación, sería hacer una distinción sin ninguna diferencia apreciable en cuanto al fin, intención o resultado, confundir la sombra con el objeto y substituir un tecnicismo legal superficial por la justicia substancial.

*Se revoca la sentencia apelada* y se declara sin lugar la demanda.

El Juez Asociado Sr. Wolf disintió.